# Hamilton et al., Appellants, *v.* Foster.

*Lease—Oil and gas lease—Minerals feræ naturæ—Mines and mining—Contracts—Construction—Duty of lessees — Damages— Burden of proof—Mistake in boring—Injunction—Discretion— Reservation—Royalties—Maxims—Æquitas sequntur legem.*

1. As between the parties to a grant of oil and gas in place, a conveyance thereof is binding and effective, even though they may escape and be lost before being reduced to absolute possession.

2. The fact that water and oil, and still more strongly gas, may be classed as minerals feræ naturæ, does not determine they are not capable of ownership when in place and may not be made the subject of a grant.

3. Oil and gas are minerals, while in place are part of the land exactly like other minerals, and may be leased separate and apart from the surface of the land and from other minerals beneath it.

4. All written instruments relating to a particular kind of business must be construed with due regard to the known characteristics of the business.

5. The fact that there is a distinction, upon questions of interpretation, between an oil and gas lease and other leases, has no relation to the interest or estate conveyed; the dominion of the owner is as absolute over the fluid as over the solid minerals.

6. It is the duty of the lessee in a gas lease to promptly locate and drill wells on the leased property, with due regard to similar operations on adjoining lands.

7. Where by a trespass one obtains possession of property which is his, damages for the trespass cannot be measured by the value of the property.

8. When the lessee of a property and all the gas and oil under it, in good faith and in the belief that he has the right so to do, bores a well at a point forbidden by the lease and obtains gas therefrom, the mistake in boring at that point does not operate to retransfer to the lessor the title to the gas.

9. An injunction will be granted only as a matter of grace in the exercise of a sound discretion, where it will not harm defendant more than it will benefit plaintiff; the rule is otherwise, however, where defendant acts in bad faith, or in a race with the law to accomplish his purpose before injunctive relief can be obtained, in which events the relative benefits and disadvantages ordinarily will not be considered.

10. Where a lease covers a tract of land and grants all the oil and gas under it, but forbids the lessor from boring wells on a part of the tract, this is not a reservation of a right on the part of the lessors to bore a well within the prohibited area. If they attempt to do so an injunction may be granted against them.

11. Where a gas well is drilled by defendant within a prohibited area, and plaintiffs, in consideration of receiving a larger royalty than is provided by the original lease, agree to the drilling therein of a second well, for the purpose of protecting the flow from the first, they cannot retain the excess royalty received from the second well and compel the abandonment of the first.

12. Plaintiff has the burden of proving the amount of damages which he suffers, and these must be measured as of the time when they accrued and not as of a later date when the circumstances are materially altered.

13. Kelly v. Phillips Gas & Oil Co., 262 Pa. 412, cited and distinguished.

Argued October 5, 1921.    Appeal, No. 63, Oct. T., 1921, by plaintiffs, from decree of C. P. Allegheny Co., Jan. T., 1920, No. 2314, dismissing bill in equity, in case of Fannie Hamilton and Helen M. Hamilton v. D. A. Foster.  Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.  Affirmed.

Bill in equity for injunction and accounting, and for declaration of trust.  Before EVANS, J.

The opinion of the Supreme Court states the facts.

Bill dismissed.  Plaintiffs appealed.

*Error assigned,* inter alia, was decree, quoting it.

*M. W. Acheson, Jr.,* of *Sterrett & Acheson,* with him *Leonard K. Guiler* and *Charles Alvin Jones,* for appellants.—Plaintiffs are entitled to an injunction: Kelly v. Gas & Oil Co., 262 Pa. 412; Duffield v. Hue, 136 Pa. 602.

Oil and gas in the earth as part of the realty belong to the owner of the land, but considered there as distinct from the soil, they do not admit of ownership or conveyance: Priddy v. Thompson, 204 Fed. 955; Jones v. Oil Co., 194 Pa. 379; Hague v. Wheeler, 157 Pa. 324; Addleman v. L. & H. Co., 255 Pa. 585; Ohio Oil Co. v. Indiana, 177 U. S. 190; Kelly v. Keys, 213 Pa. 295; Burgan v. Oil Co., 243 Pa. 128, 136; Superior Oil & Gas Co. v. Mehlin, 25 Okla. 809; Huggins v. Daley, 99 Fed. 606; Steelsmith v. Gartlan, 44 L. R. A. 107, 113.

*John C. Bane,* with him *A. M. Simon,* for appellee.—Being minerals, oil and gas are parts of the land: Funk v. Haldeman, 53 Pa. 229; Gill v. Weston, 110 Pa. 312; Blakley v. Marshall, 174 Pa. 425; Ontario Nat. Gas Co. v. Smart, 19 Ont. R. 591; Marshall v. Mellon, 179 Pa. 371; Stoughton's App., 88 Pa. 198.

Oil and gas being minerals, are land; and being land, are transferable by deed: Clement & Masser v. Youngman & Walter, 40 Pa. 341; Blakley v. Marshall, 174 Pa. 425; Barnsdall v. Gas Co., 225 Pa. 338.

The contention that defendant's claim of title to all the oil and gas to be found under this land is affected by the fact that oil and gas are believed and held to be fugacious, and to move about from place to place, is wholly unsustainable in either law or logic: Westmoreland, etc., Nat. Gas Co. v. DeWitt, 130 Pa. 235; Hague v. Wheeler, 157 Pa. 324.

OPINION BY MR. JUSTICE SIMPSON, January 3, 1922:

Beginning at least as early as 1907 and lasting until 1920, when this litigation began, the Fidelity Title and

Trust Company of Pittsburgh had full charge and control of a farm belonging to plaintiffs. It leased and sold portions of the property, divided a part thereof into building lots, collected rents, paid taxes and other charges, and, as "attorneys in fact," sent to plaintiffs, at regular intervals, statements of account, thereafter applying the balances as plaintiffs directed. In a few comparatively trivial things they did not fully agree with the trust company, but such differences were always adjusted before the matter was communicated to others, plaintiffs doing nothing in regard to the property, save by and through the trust company, with whom they advised when requested and at whose instance they executed deeds, leases and other papers. It is not necessary to determine whether the agency arose and was continued because of a letter of attorney given to the trust company by plaintiffs, as remaindermen, and by the then life tenant, who has since died, or was simply the result of a long continued course of conduct; it suffices that the relation existed during the period stated, and that, so far as third parties were concerned, all arrangements in relation to the property were made with the trust company acting for plaintiffs, and not with plaintiffs themselves.

Because much of the property was a continuing expense and not a source of revenue, the trust company, at plaintiffs' request, entered into negotiations with defendant, resulting in a lease, dated October 31, 1918, drawn by it, but executed by plaintiffs and defendant personally, whereby plaintiffs "granted, demised, leased and let unto [defendant] his heirs, executors, administrators and assigns, all the oil and gas in and under all that certain tract of land, and also said tract of land hereinafter described [being most of the farm, including the part laid out into building lots], with covenants of general warranty that [plaintiffs] had the sole right to convey the premises to [defendant], with the exclusive right of drilling and operating thereon for and

producing oil and gas, and all rights necessary, convenient and incident thereto; such in part as the right to construct and maintain buildings, telegraph, telephone and pipe lines leading from adjoining lands, on and across this leasehold and other lands of [plaintiffs], and similar rights for roadways and the right to use water, oil and gas from the premises for operating purposes......also the right of subdividing and releasing the whole or any part" thereof, the lease to "remain in force for the term of ten years......and as long thereafter as oil or gas is produced from the premises or as operations continue for the production of oil and gas." On the margin of the lease is written, inter alia: "It is understood and agreed that no wells are to be drilled on the plan of lots laid out upon the portion of the tract covered by this lease."

It will be noted that (with an exception not necessary to consider), this is a grant of all the oil and gas in and under the entire tract, including the plan of lots, and is also a lease of the tract itself; and gave to defendant as plenary powers in the use of the land, and the ownership of the oil and gas under it, as plaintiffs themselves previously had: Westmoreland Natural Gas Co. v. De-Witt, 130 Pa. 235, 251-2.

Defendant fully complied with the terms and conditions of the lease. He promptly bored two wells upon the property, each outside of the plan of lots, and obtained from them gas in paying quantities. With the intention of drilling a third well, he cut away some of the trees and thick undergrowth on a hilly part of the farm, at a point which he believed was outside of the plan, but before any boring was done an employee of the trust company informed him this was a mistake. Because of what he had been told, defendant expressed a doubt on the subject, but, rather than have a dispute regarding it, said he would not sink a well there, and would remove the derrick and machinery to another part of the property. The employee suggested, however, it

would be wiser, before doing this, to call upon and advise with the trust officer of the trust company. When he did so, he was informed he could drill the well at the place selected, and, purporting to act under the power of attorney above referred to, the trust officer gave to defendant a letter, referring to the power and to the fact that the proposed well was within the plan of lots and authorizing him to drill at that point. Well No. 3 was then bored, and therefrom gas was obtained in large quantities.

Before this work was begun, the trust company wrote plaintiffs: "The gas men are now boring on two more wells, one up in the woods [being well No. 3] and one up the run near the park line"; but through some oversight failed to definitely advise them of the giving of said letter.

The obtaining of gas in large quantities from this well, caused other land in the vicinity to become valuable for speculative purposes, and the surrounding property was leased to other prospectors, who endeavored to draw the gas away from well No. 3, by drilling others near plaintiffs' line. Fearing the success of such endeavors, and apparently recognizing it was a lessee's duty to locate his wells with due regard to the operations on adjoining lands (McKnight v. Manufacturers Natural Gas Co., 146 Pa. 185, and Kleppner v. Lemon, 176 Pa. 502), the trust company, as attorney in fact for plaintiffs, entered into negotiations with defendant for the drilling of another well on plaintiffs' property, within the plan of lots, at a point near the wells on the adjoining tract and so situated as to protect the outflow from well No. 3. A well bored off the plan would not have given the desired security. While these negotiations were pending, the trust company wrote plaintiffs that defendant "has finally offered 1/16 of the gas, if we grant him permission to locate another well on these lots [28 and 29 on the plan]. In the event that a well comes in as large as the other well, [which was well No. 3], our share will be

nearer $500 a day than $500 a year." Following this, an agreement was entered into, signed by plaintiffs and defendant personally, authorizing the latter to sink well No 4 at the point suggested, in consideration of the royalty stated; and when it was drilled gas flowed therefrom in paying quantities, but not of the volume obtained from well No. 3.

Defendant from time to time paid to the trust company the amounts due under the terms of the lease, and the latter remitted them to plaintiffs, specifying in the accounts for which well the rent was paid. Plaintiffs received them not knowing that well No. 3 had been bored within the plan of lots, and, immediately after definitely learning this fact, sent to defendant a check for the amounts paid for it, which he as promptly returned. The matter apparently remains in this shape, plaintiffs having the money and being ready to repay it to defendant. There was no return or offer to return any part of the royalty received from well No. 4.

A few days later plaintiffs filed their bill in equity averring that well No. 3 was wrongfully bored upon the plan of lots, that by reason thereof all the gas derived from it belonged to them and not to defendant, and praying an injunction, an accounting for all gas taken, and an award of damages. An answer was filed denying plaintiffs' right to any relief, the two pleadings setting up the facts substantially as above set forth; and, though much testimony was taken at the trial, nothing else of importance was developed.

The court below held that defendant had the right, under the letter given by the trust company to him, to bore the well at the place he did; that an injunction would not be granted in any event, since it would do more harm than good; and that as the gas under the whole of the tract, including that under the plan of lots, had been expressly granted to him, the utmost plaintiffs could recover would be such damages as they suffered by reason of the location of the well on that plan, and as

none had been proved nothing could be awarded.    A final decree dismissing the bill was thereupon entered and plaintiffs appealed.

In our opinion the decree is right.    Much of the difficulty, under which appellants labor, would be removed if they did not attempt to extend the comparison made in Westmoreland Natural Gas Co. v. DeWitt, 130 Pa. 235, 249, far beyond the purpose for which it was intended.    It was there said: "Water and oil, and still more strongly gas, may be classed by themselves, if the analogy be not too fanciful, as minerals feræ naturæ." The analogy is not too fanciful, when understood in the sense in which the words were used, as appears in the next sentence: "In common with [wild] animals, and unlike other minerals, they have the power and the tendency to escape without the volition of the owner"; but the first statement, whether or not qualified by the second, does not determine that oil and gas are not capable of ownership even when in place, or may not be the subject of a grant.    On the contrary, in this State these matters are firmly established otherwise.

It has been many times decided that oil and gas are minerals, though not commonly spoken of as such, and while in place are "part of the land" (Kier v. Peterson, 41 Pa. 357, 362; Funk v. Haldeman, 53 Pa. 229, 249; Stoughton's App., 88 Pa. 198, 201; Marshall v. Mellon, 179 Pa. 371, 374) ; like other minerals within the bounds of the freehold (which extends to the centre of the earth: Chartiers Block Coal Co. v. Mellon, 152 Pa. 286, 295), they may be the subject of sale (which is precisely what in legal effect this lease accomplishes: McIntosh v. Ropp, 233 Pa. 497, 512), separate and apart from the surface and from any other minerals beneath it.    This being true,—and it is not disputed by appellants,—like all other minerals they necessarily belong to the owner in fee or his grantee, so long as they remain part of the property, and though he cannot use them until he has severed them from the freehold, exactly as in the case of

all other minerals beneath the surface, he nevertheless has an ownership which he can sell and which otherwise he will lose only by their leaving the property.

It is of course true that there is a distinction, upon questions of interpretation, between an oil and gas lease and an agricultural and even a coal lease (Wettengel v. Gormley, 160 Pa. 559; Kleppner v. Lemon, 176 Pa. 502; Burgan v. South Penn Oil Co., 243 Pa. 128), the reason being that leases, like all other instruments relating to a particular business, must always be construed with due regard to the known characteristics of the business (McKnight v. Manufacturer's Natural Gas Co., 146 Pa. 185, 200); but "there is no difference [between them] as respects the interest or estate conveyed" (Prager's Estate, 74 Pa. Superior Ct. 592, 595); and, as to the owner in fee and his grantees, their "dominion is, upon general principles, as absolute over the fluid as over the solid minerals. It is exercised in the same manner and with the same results": Hague v. Wheeler, 157 Pa. 324, 341.

But it is said that defendant's act in boring the well within the plan of lots was a trespass and hence no title could be acquired. For the sake of the argument both those claims may be conceded and yet plaintiffs will not have advanced a step along the road to the relief they ask. In the present case the title to the gas as between plaintiffs and defendant was vested in him by the lease, subject only to be divested through the action of natural laws which did not operate here. Therefore we do not have to decide whether or not a title can be acquired by a trespass, but at the most what recovery can be had against one who, by a trespass, obtains possession of his own property; and certainly this cannot be measured by its value. True, an injunction may be granted if the trespass threatens to be a continuing one, but in the instant case this rule does not apply for the reasons hereafter stated.

The decision of the main question is, therefore, free from difficulty. As between plaintiffs and defendant,

the grant of all the gas under the entire tract was as absolute as it would have been if the subject-matter had been of any other mineral below the surface, or of standing timber upon it. True, it might not all be reduced to absolute possession during the term of the lease, and hence, when it ended, that which was not taken would revert to the ownership of plaintiffs; but this rule would also apply to other minerals and to standing timber, in each case for the same reason.

If plaintiffs themselves had sunk well No. 3, at the exact spot where it now is, the act would have been a wrongful one (Lynch v. Burford, 201 Pa. 52; Brown v. Spilman, 155 U. S. 665), all the gas obtained would have been defendant's, because of the grant to him of "all the oil and gas in and under" the entire tract, and plaintiffs would have been required to account to him for its value. It necessarily follows that when, in good faith and in a belief that he had the right so to do, he bored the well at that point, and thereby obtained the gas, he but reduced to possession that which plaintiffs had granted to him, and therefore, since he secured it during the term of the lease, this cannot result in retransferring the title to them.

Nor did the court below err in refusing to grant an injunction. This writ is of grace, in the exercise of a sound discretion, and not of right; is ordinarily only preventive in its nature and not restorative; and will not be issued where it will harm a defendant more than it will benefit a plaintiff, and certainly never where, as here, plaintiffs would probably lose more than they would gain. Had defendant bored well No. 3 in bad faith, or in a race with the law to accomplish his purpose before injunctive relief could be obtained, the chancellor doubtless would have issued the writ; for, under such circumstances, his conscience is too tender to permit a defendant to derive any advantage from his acts, even though it is difficult to see how plaintiffs would be benefited. It was upon the first of these grounds we

sustained the injunction in Kelly v. Phillips Gas & Oil
Co., 262 Pa. 412, where indeed the lessor did not grant
the oil and gas under the tract, but only a right to search
for it; reserved "the free use and enjoyment of the prem-
ises except the parts necessary for drilling and oper-
ating"; the defendant in bad faith "entered upon the
prohibited area, with full knowledge of the fact it was
so doing, and was not induced either to begin or to con-
tinue the operation of drilling this well by any act or
conduct on the part of the plaintiff," who lived upon the
property and was, therefore, injured by the work being
done in close proximity to his dwelling. In the present
case, however, the court below properly found that de-
fendant acted in good faith, under written authority
from those left by plaintiffs in charge of the property,
and this is a potent factor even if the trust company ex-
ceeded the powers given by the letter of attorney.

Appellants' claim to this character of relief is based
largely upon their alleged inability to give to defendant
a title to the gas, because of its fugitive nature, no mat-
ter what would be the natural construction of the lan-
guage used in the lease; and for that reason, they say,
he has no right to take it and ought to be enjoined from
so doing. We have already answered this contention,
and need only add that if there can be no ownership until
the gas is reduced to actual possession, then plaintiffs
themselves have no ownership, for it is as fugitive in
their case as it is in his, and hence they have no standing
to complain because he gets it. Perhaps this conclusion
demonstrates, as effectively as any argument could, the
fallacy of their contention that, as between the parties
themselves, there could be no grant of ownership of the
gas because of its fugacious character.

The inequity of granting an injunction is apparent
when the matter is viewed from another standpoint. It
is a well-known fact that oil and gas may be readily
drawn from one part of the underlying field to another
(Kleppner v. Lemon, 176 Pa. 502; Burgan v. South Penn

Oil Co., 243 Pa. 128; Highfield Co. v. Kirk, 248 Pa. 19),
and therefore a lessee in such cases must act with great
promptness in sinking and due care in selecting the
place to bore a well, lest others are drilled on adjoin-
ing property (and in this territory there are many others
already in operation), which will exhaust the gas to the
detriment of the lessor. It follows that the drilling of
well No. 4, at the point in lots 28 and 29 was a wise act,
and the purpose to be conserved thereby, namely, the
protection of well No. 3, was a proper purpose. Plain-
tiffs, however, cannot have the benefit of the excess roy-
alty paid by defendant, because of the necessity for this
protection, without affirming defendant's right to place
the well where it is. If its use was enjoined, in all prob-
ability either all the gas now secured through it would
go to the wells on other properties, or partly there and
partly to well No. 4, or wholly to the latter; these
last-named contingencies being one of the reasons, as-
serted in the bill in equity and in appellants' printed
argument, why an injunction should be granted. If the
gas all went to other properties both parties would lose,
and this possibility alone would give the chancellor
much pause. In either of the other events plaintiffs
would get a larger sum for the gas they granted to de-
fendant than by the lease they were entitled to have,
simply because it came through well No. 4, though it
was drilled for the express purpose of protecting the flow
from well No. 3, and the larger payment was agreed upon
because it would probably effect this purpose.

Plaintiffs, of course, had and have the privilege of re-
fusing to accept any real and immediate advantage, and
to stand on their strict legal rights, preferring a possible
future gain, however remote, speculative and imaginary,
it may be; but they can hardly expect a chancellor to
follow them into this realm, to the injury of themselves
and a still greater injury of defendant, who in good faith
expended a large sum of money in drilling these two
wells for their joint account. It is true, as the event

happened, defendant made a large profit from well No. 3, but the law cannot deprive him of the benefit of this bargain, any more than it can take from him anythng else that is his, and a court of equity can go no further in this respect: æquitas sequntur legem. Had no gas been obtained, doubtless plaintiffs would be unable to see any equity in a claim that they suffer a part of the loss; that a gain resulted in which they have shared and are sharing stands in the way of their present contention, which in effect is that they are not only entitled to keep the enhanced royalty heretofore derived from well No. 4, but to increase it by destroying well No. 3, whereas, as already stated, the former would not have been drilled, or the larger royalty agreed upon, but for the purpose of protecting, for joint benefit, the flow from the latter.

Nor are plantiffs in any better position on the question of damages. Having elected to claim them in this suit, plaintiffs had the burden of proof of establishing the amount thereof; they made no attempt to do this and when defendant proposed to show what would have been a proper royalty, the offer was overruled because of their objection that it was irrelevant and immaterial.

The quantity of gas derived from well No. 3 could not measure plaintiff's damages, if any, not only for the reasons already stated, but because also it might all have been obtained by defendant (as indeed he testified it could, and no one contradicted him), through wells bored outside of the plan of lots, during the indefinite period he was entitled, under the lease, to retain possession for this purpose; and therefore a decree for an accounting would not have been an appropriate order. The hint that plaintiffs might be entitled to receive, as a royalty, the same proportion of gas subsequently provided for in the agreement relating to well No. 4, cannot be sustained, for the situation had seriously altered between the time well No. 3 was drilled and the date of this agreement. As a result of the great volume of gas obtained from well No. 3, landowners were justified in de-

manding much more than was theretofore obtainable. Moreover, as already stated, defendant gave an increased royalty in order to protect the flow from it, and hence, if plaintiffs' contention was sustained, we would have the anomaly of defendant paying for the gas obtained from well No. 3, what he was willing to pay to protect this gas itself, not what the royalty for No. 3 was otherwise worth.

The decree of the court below is affirmed and the appeal is dismissed, at the cost of appellants.